UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| PRESTIGE INSTITUTE FOR PLASTIC SURGERY, P.C., and KEITH M. BLECHMAN, M.D., P.C., on behalf of PATIENT NP, <br><br> Plaintiffs, <br><br> v. <br><br> HORIZON BLUE CROSS BLUE SHIELD OF NEW JERSEY, and INDEPENDENCE BLUE CROSS, <br><br> Defendants. | Case No. |

# **COMPLAINT**

By way of this Complaint, and to the best of its knowledge, information, and belief, formed upon a reasonable inquiry under the circumstances, Plaintiff Prestige Institute for Plastic Surgery, P.C. ("Prestige"), and Keith M. Blechman, M.D., P.C. ("Blechman") (collectively, "Plaintiffs"), on behalf of Patient NP bring this action against Horizon Blue Cross Blue Shield of New Jersey ("Horizon") and Independence Blue Cross ("IBC") (together, "Defendants").

1.  This is an action under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), and its governing regulations, concerning Defendants' under-reimbursement to Plaintiffs for the post-mastectomy breast reconstruction surgical services Plaintiffs provided to Patient NP.

2.  IBC was the insurer for the Thomas Jefferson University Hospital Employer Plan (the "Plan"), in which the Patient, NP, was the Plan participant.

3. Under the Blue Cross Blue Shield Blue Card Program, which applied in this case, and in which Horizon and IBC participated, IBC was the Home Plan and Horizon was the Host Plan.

4. IBC applied its own payment methodology, denied Plaintiffs' appeals of the significant under-reimbursement of claims in this case, and imposed out-of-network patient responsibility liability on Patient NP.

5. Patient NP was initially diagnosed with breast cancer. She underwent a bilateral mastectomy. On August 21, 2017, Joseph F. Tamburrino, M.D. and Blechman performed bilateral breast reconstruction surgery as co-surgeons. On November 22, 2017, Tamburrino performed additional breast reconstruction surgery.

6. Tamburrino and Blechman do not participate in Horizon's network of contracted health care providers.

7. After each of these breast reconstruction surgeries, Plaintiffs submitted invoices in the form of CMS-1500 forms as required for a total amount of $293,533.29. In violation of Federal and State law, Defendants reimbursed Plaintiffs only $5,263.92, leaving an unreimbursed amount of $288,269.37, or 98% of the total amount, as the Patient's liability.

## **JURISDICTION**

8. The Court has subject matter jurisdiction over Plaintiff's ERISA claims under 28 U.S.C. § 1331 (federal question jurisdiction).

9. The Court has personal jurisdiction over the parties because Plaintiff submits to the jurisdiction of this Court, and Defendants systematically and continuously conduct business in the State of New Jersey, and otherwise have minimum contacts with the State of New Jersey sufficient to establish personal jurisdiction over them.

10. Venue is appropriately laid in this District under 28 U.S.C. § 1391 because (a) Horizon has an agent and transacts business in the District of New Jersey, and (b) IBC has an agent and transacts business in the District of New Jersey.

11. Venue is also appropriate under 29 U.S.C. § 1132(e)(2), which requires that an ERISA plan participant has the right to bring suit where she resides or alleges that the violation of ERISA occurred. Plaintiffs allege that Defendants violated ERISA within the District of New Jersey.

## PARTIES

12. Plaintiff Prestige Institute for Plastic Surgery, P.C., is a physician practice group led by Joseph F. Tamburrino, M.D. Dr. Tamburrino is double-Board-certified in plastic surgery by the American Board of Plastic Surgery and the American Board of Surgery. He received his medical degree from Thomas Jefferson Medical College and completed his residency training in general surgery at Temple University Hospital. He completed his plastic surgery residency at the Cleveland Clinic. He received fellowship training in Reconstructive Microsurgery at UCLA. Plaintiff's office is located in Cherry Hill, New Jersey.

13. Plaintiff Keith M. Blechman, M.D. is a plastic and reconstructive surgeon whose office is located on Park Avenue in New York City. He received his medical degree from New York University School of Medicine and New York University's Institute for Reconstructive Plastic Surgery where he studied stem cell biology application in wound healing and tissue regeneration. He completed a reconstructive microsurgery fellowship at M.D. Anderson Cancer Center.

14. Defendant Horizon Blue Cross Blue Shield of New Jersey is a health care insurance company with offices located in New Jersey and offers Blue Cross Blue Shield-branded health care insurance in the State of New Jersey. Its principal office is in Newark, New Jersey.

15. Defendant IBC is a health care insurance company with offices located in Philadelphia, Pennsylvania.  It is the insurer for the Plan.

## FACTUAL ALLEGATIONS

### A. The Blue Card Program

16. The Blue Card Program, in which each Blue Cross Blue Shield ("BCBS") licensee must participate, including Horizon and IBC, was the direct result of the practice of all the BCBS licensees, under the direction of the Blue Cross Blue Shield Association ("BCBSA"), to engage in exclusive geographical market allocation.  Under this practice, each BCBS licensee was allocated an exclusive geographic market to market health insurance. This practice continues today.

17. Horizon's allocated exclusive market is the State of New Jersey and certain contiguous counties.  It cannot otherwise offer health insurance in the Commonwealth of Pennsylvania, which is allocated to IBC.

18. IBC's allocated exclusive geographical market is certain counties in the Commonwealth of Pennsylvania surrounding Philadelphia and certain contiguous counties.  It cannot offer health insurance in any adjacent state.

19. These restrictions insulate Horizon and IBC against competition from each other in their respective exclusive geographic market areas.

20. As part of their mandatory agreement to participate in the Blue Card Program, Horizon and IBC also commit that other than in contiguous areas (counties adjacent to their allocated geographical market areas), they will not contract, solicit or negotiate with providers outside of their allocated geographical market areas.

21. To make this mandatory agreement work, the BCBSA created Home and Host Plans.

22.     The Blue Cross insurer in the exclusive geographical area through which the member is enrolled is the Home Plan. In this case, it is IBC. The Blue Cross Blue Shield insurer located in the exclusive geographical area where the service is provided is referred to as the Host Plan. In this case, it is Horizon.

23.     When a provider network is involved, IBC would rely on Horizon's network under the Blue Card Program, since Horizon is the Host Plan where the provider's services are provided. IBC would still look to Horizon to determine whether Tamburrino and Blechman were in Horizon's network. In this case, Tamburrino and Blechman were out-of-network with Horizon. As noted above, IBC was prohibited from contracting with Tamburrino and Blechman directly and relied on the adequacy of Horizon's network and compliance with New Jersey law.

24.     Under the Blue Card Program, Tamburrino and Blechman were required to and did bill Horizon, not IBC, since the surgical services were rendered in New Jersey. Under the Blue Card program, and in this case, Horizon was the agent of IBC.

### B.      August 21, 2017 Breast Reconstruction

25.     One in eight women in the United States have or will develop breast cancer. Their individual choices on how to treat their breast cancer – by a lumpectomy, mastectomy, chemotherapy, radiation, and subsequent breast reconstruction – go well beyond treating and removing the cancerous cells in their bodies because these choices must be based on their individual identities. Breast reconstruction is a choice, and once made, under federal law it must be fully covered.

26.     Breast reconstruction is a federal mandate under the Women's Health and Cancer Rights Act ("WHCRA"), enacted in 1998, which requires that group health plans cover breast reconstruction procedures after a mastectomy. This law, codified at 29 U.S.C. § 1185b, states:

> (a) In general. A group health plan . . . shall provide, in case of a participant or beneficiary who is receiving benefits in connection with a mastectomy and who elects breast reconstruction in connection with such mastectomy, coverage for –
>
>> (1) all stages of reconstruction of the breast on which mastectomy has been performed . . . in a manner determined in consultation with the attending physician and the patient.  Such coverage may be subject to annual deductibles and coinsurance provisions as may be deemed appropriate and as are consistent with those established for other benefits under the plan or coverage . . .
>
> (d)   Rule of construction. Nothing in this section shall be construed to prevent a group health plan or a health insurance issuer offering group health insurance coverage from negotiating the level and type of reimbursement with a provider for care provided in accordance with this section.

27.   Under 29 U.S.C. § 1185b(c), a "group health plan, and a health insurance issuer offering group insurance coverage in connection with a group health plan, may not (2) penalize or otherwise reduce or limit the reimbursement of an attending provider . . ." Under 29 U.S.C. § 1185b(d), a group health plan or insurer may negotiate with a provider.  Therefore, under the WHCRA and the terms of the Plan the Defendants should have, but failed to, negotiate with Plaintiffs to eliminate the balance bill and all other out-of-network patient liability amounts.

28.   The WHCRA was enacted in October 21, 1998, not only because of horror stories of "drive-through mastectomies" in which women were forced into four-hour out-patient mastectomy surgeries by their insurance companies to save money, but because of denials of coverage for breast reconstruction on the basis that such reconstruction was cosmetic.  As Senator Snowe stated in committee:

> We have also found that breast reconstructive surgery is considered cosmetic surgery.  Well, it is not.  Forty-three percent of women who want to undergo breast reconstructive surgery cannot because it is deemed cosmetic.  And that is wrong.  Breast reconstructive surgery is designed to restore a woman's wholeness.

144 Cong. Rec. § 4644 at *4648 (May 12, 1998).

29.   Accordingly, breast reconstruction was a covered service under Patient NP's Plan.

30. Because a woman must and does have a choice about her body, this includes the choice of what specialist she can trust for her breast reconstruction procedures. Breast reconstruction is a complex surgery with many options. The Deep Inferior Epgastric Perforator Flap ("DIEP") procedure provides the best psychological outcome and long-term prospects. The DIEP procedure is a cutting-edge micro-surgical breast reconstruction procedure that utilizes a flap of complete tissue, blood vessels, skin and fat from a woman's lower abdomen as donor tissue rather than the shoulder to create breast flaps. The flap is then transplanted to the chest where the vessels are connected to the chest vessels. The flap is then shaped into a new breast and the abdomen is surgically closed. Unlike a TRAP flap, a different and older breast reconstruction procedure, the DIEP procedure preserves the abdominal muscles and allows for the preservation of abdominal strength and integrity. However, the procedure requires two co-surgeons specializing in microsurgery working together in a surgery that lasts for 8-12 hours. There are few surgeons with the proper specialized training to perform this complex procedure. The surgery is performed by plastic surgeons who are board-certified and who have completed a post-residency fellowship in plastic surgery, and micro-surgical reconstructive surgery.

31. On August 21, 2017, Patient NP underwent bilateral breast reconstruction at Our Lady of Lourdes Medical Center in Camden, New Jersey, immediately subsequent to a bilateral mastectomy. Dr. Tamburrino, who was co-surgeon, performed the DIEP procedure. He received prior authorization from IBC for this medically necessary procedure.

32. After performing this breast reconstruction surgery, Tamburrino submitted an invoice on a CMS-1500 form to Horizon, as required, for $111,397.36. The billed amounts, paid amounts, and CPT codes were as follows:

| CPT | Billed Amount | Paid Amount |
| --- | --- | --- |
| S2068-62-RT | $50,000.00 | $794.00 |

7

| | | |
|---|---|---|
| S2068-62-LT | $50,000.00 | $630.90 |
| 35761-RT | $5,698.68 | $132.10 |
| 35761-LT | $5,698.68 | $132.10 |
| **Total** | **$111,397.36** | **$1,690.08** |

S2068 is a HCPCS Level II Code for a DIEP procedure. CPT code 35761 is artery and vein repair. Modifier -62 means co-surgeon.

33. IBC reimbursed Tamburrino incorrectly. It did not cover the breast reconstruction procedures under the WHCRA, and reimbursement should not have been reduced.

34. In addition, IBC applied the multiple surgery rule for the bilateral codes S2068-62-RT and LT (reducing the left code) but paid the same amount for CPT code 35761-RT and LT. The multiple surgical rule is appropriate in those limited occasions when multiple procedures are separately compensable, performed by the same provider, but are secondary to the primary procedure. In this case, bilateral procedures are not connected by definition, since they were performed by two co-surgeons, and must be reimbursed as separate and independent surgical procedures. The fact that IBC reimbursed CPT code 35761-RT and LT equally conceded the fact that the multiple surgery rule was inapplicable.

35. Prestige filed a first-level appeal concerning the amount of Defendants' reimbursement of Tamburrino's bill on February 14, 2018.

36. IBC denied this appeal in a letter dated March 27, 2018. It stated that "the enrollee's claim was processed correctly in accordance with her Personal Choice plan provision for inpatient professional services performed by an out-of-network provider."

37. IBC further stated that "Covered Expense" meant "the lesser of the Medicare Professional Allowable Payment or of [sic] the Provider's charges for Covered Services." For services that were not recognized or reimbursed by Medicare, the amount was determined by an

"applicable fee schedule or the Provider's charges." For services not recognized by this fee schedule, the amount was determined by reimbursing 50% of the Professional Provider's billed charges.

38. IBC did not explain how Prestige's claim was reimbursed. It simply stated that "out-of-network providers are reimbursed according to the Medicare professional allowable payment or the claim administrator's proprietary fee schedule."

39. Further, IBC did not disclose whether the Medicare traditional program recognized either HCPCS Level II Code S2068 or CPT Code 35761.

40. Medicare does not recognize HCPCS Level II Code S2068. IBC did not disclose or explain the methodology of its "applicable fee schedule," or even if it applied such a schedule in this instance. Since IBC clearly did not reimburse Tamburrino based on 50% of his billed charges, the explanation of what methodology IBC utilized was especially important.

41. Even as to CPT Code 35761, IBC did not disclose the percentage of Medicare rates that it utilized – whether 85%, 125%, 100%, or some other amount. If it did not use Medicare, IBC was silent on what formula – its "applicable fee schedule" or some other methodology – it did utilize to reimburse Plaintiff in this case.

42. The Plan terms specified how Tamburrino's breast reconstruction procedure must be reimbursed. Under the WHCRA, which is incorporated in every Plan, reimbursement cannot be reduced by applying out-of-network rates. The procedure must be covered.

43. According to the March 27, 2018, appeal denial letter, however, Defendants failed to base Tamburrino's reimbursement on the WHCRA or on the terms of the Plan.

44. On May 22, 2018, Prestige filed a second-level appeal concerning the amount of Defendants' reimbursement of Plaintiff's bill.

45. IBC refused to process this appeal on the purported grounds that it was untimely. It concluded that it received Prestige's appeal on June 1, 2018, more than 60 days from the March 27, 2018, date of the first-level denial of the first-level appeal.

46. IBC's refusal to process the appeal was groundless and is the basis for exhaustion of administrative remedies. Under the terms of the Plan, a member of her assignee may *submit* a second-level appeal within 60 days after receipt of the denial letter for the first-level appeal. Prestige submitted the second-level appeal on May 22, 2018, 56 days after the date of the first-level appeal (not including the receipt date). The Plan does not state that the 60-day period continues until IBC *receives* the second-level appeal.

47. By refusing to consider and process Prestige's second-level appeal, even though the appeal was sent timely, IBC demonstrated that exhaustion of administrative remedies was futile.

48. After performing the same breast reconstruction surgery, Blechman submitted an invoice on a CMS-1500 form to Horizon, as required, for $111,200.00. The billed amounts, paid amounts, and CPT codes were as follows:

| CPT | Billed Amount | Paid Amount |
| --- | --- | --- |
| S2068-62-RT | $50,000.00 | $1,278.60 |
| S2068-62-LT | $50,000.00 | $639.30 |
| 35761-RT | $5,600.00 | $42.27 |
| 35761-LT | $5,600.00 | $21.14 |
| **Total** | **$111,200.00** | **$1,981.31** |

49. It is significant that, notwithstanding that the CPT codes Blechman billed are identical to those Prestige billed, the paid amounts are different.

50. IBC reimbursed Blechman incorrectly. It applied out-of-network rules when under the WHCRA, reimbursement should not have been reduced.

51. In addition, IBC applied the multiple surgery rule for the bilateral codes S2068-62-RT and LT (reducing the left code) and for CPT code 35761-RT and LT. This was improper.

52. Blechman filed a first-level appeal concerning the amount of Defendants' reimbursement of Blechman's bill on April 18, 2018.

53. IBC denied this appeal in a letter dated May 25, 2018. It stated that the "the claim was processed correctly and in accordance with the Tier 3 benefits because the surgical services were rendered by an out-of-network provider."

54. As compared to the appeal denial letter generated for Prestige, the appeal denial letter generated for Blechman did not define "Covered Expense." IBC stated that to find the definition, one must consult an unidentified benefit booklet.

55. The Plan terms specified how Blechman's breast reconstruction procedure must be reimbursed. Under the WHCRA, which is incorporated in every Plan, reimbursement cannot be reduced by applying out-of-network rates. The procedure must be covered.

56. According to the May 25, 2018 appeal denial letter, however, Defendants failed to base Blechman's reimbursement on the WHCRA or on the terms of the Plan.

57. On July 13, 2018, Blechman filed a second-level appeal concerning the amount of Defendants' reimbursement of Plaintiff's bill.

58. IBC denied this appeal in a letter dated August 17, 2018. It stated that "the claim has been processed correctly and in accordance with [NP's] out-of-network benefits."

59. Again, Defendants failed to apply the WHRCA or the Plan terms to this claim. They also failed to explain the methodology they utilized for Patient NP's out-of-network benefits, describing her deductible and co-payment liability instead.

60. Blechman exhausted his administrative remedies on behalf of Patient NP.

61. Patient NP assigned this claim to Blechman. The Assignment stated, in pertinent part:

> I . . .hereby assign . . .directly to Dr. Keith M. Blechman, Keith M. Blechman, M.D., P.C . . .to the fullest extent permitted under the law any and under any applicable employee group health plan(s), insurance policies or liability claim, any claim, cause of action, or other right I may have . . .as a result of the medical services I received [and including] "to pursue such claim, chose in action against any liable party.

62. Plaintiff received a Designation of Authorized Representative from Patient NP. It stated, in relevant part:

> I . . .hereby convey directly to Dr. Keith M. Blechman, Keith M. Blechman, M.D., P.C. . . . all medical benefits and/or insurance reimbursement, if any otherwise payable to me . . . as my Statutory Derivative Beneficiary, commonly known as a Designated Authorized Representative, of all medical benefits and/or insurance reimbursement.

### C. November 22, 2017 Breast Reconstruction

63. On November 22, 2017, Dr. Tamburrino performed additional breast reconstruction procedures on Patient NP as part of the continuation of care: fat grafting to shape the breasts, bilateral nipple-areolar reconstruction, and surgical repair of the abdominal donor site.

64. Prestige submitted an invoice on a CMS-1500 form, as required, for $70,935.93. The billed amounts, paid amounts, and CPT codes were as follows:

| CPT | Billed Amount | Paid Amount |
| --- | --- | --- |
| 14301 | $15,431.91 | $469.48 |
| 19350-LT | $11,834.81 | $178.87 |
| 19350-RT | $11,834.81 | $178.87 |
| 19380-LT | $11,089.91 | $205.48 |
| 19380-RT | $11,089.91 | $205.48 |

| | | |
|---|---|---|
| 15770-LT | $9,654.58 | $177.15 |
| 15770-RT | $9,654.58 | $177.15 |
| **Total** | **$70,935.93** | **$1,592.48** |

CPT code 14301 is Adjacent Tissue Transfer or Rearrangement Procedures on the Integumentary (Skin) System. CPT code 19350 is breast reconstruction. CPT code 19380 is revising an already reconstructed breast. CPT code 15770 is Flaps and Grafts Procedures.

65. Prestige filed a first-level appeal and a second-level appeal concerning Defendants' under-reimbursement on July 5, 2018 and November 26, 2018, respectively.

66. IBC denied the appeals on January 25, 2019. It simply stated that "it was determined the services were priced correctly." No further explanation was provided.

67. Patient NP assigned her payments to Prestige. The Assignment stated, in pertinent part:

> I hereby assign and convey to the fullest extent permitted under the law any and under any applicable employee group health plan(s) [or] insurance policies, any claim, cause of action, or other right I may have . . .as a result of the medical services I received [and including] to pursue such claim, chose in action against any liable party.

68. Prestige received a Designation of Authorized Representative from Patient NP. It stated, in relevant part:

> I hereby . . .convey directly to Prestige Institute for Plastic Surgery, P.C. and Dr. Joseph Tamburrino as my Statutory Derivative Beneficiary, commonly known as a Designated Authorized Representative, of all medical benefits and/or insurance reimbursement.

69. ERISA allows a Designated Authorized Representative to bring litigation on behalf of a Plan Participant or Beneficiary of an ERISA Plan.

70. Breast reconstruction was a covered service under Patient NP's Plan because it was mandated under the WHCRA.

71. Notwithstanding this federal mandate, upon information and belief Horizon did not have any in-network providers with admitting privileges at Our Lady of Lourdes Medical Center who were qualified to perform the highly specialized microsurgical DIEP breast reconstruction surgery that was performed on Patient NP working as a team with the in-network breast surgeon who performed the mastectomy.

72. Defendants' decision to assess the patient $179,050.73, or 98% of the total amount in out-of-pocket costs for breast reconstruction surgeries that must be covered was not a coverage decision. It was, instead, a decision forcing Patient NP to self-insure her own breast reconstruction surgery, in violation of the WHCRA.

### D.      **Failure to Cover Breast Reconstruction under New Jersey Law**

73. That decision was also a violation of New Jersey law. On May 3, 2013, the Commissioner of New Jersey's Department of Banking and Insurance ("DOBI") issued Bulletin 13-10 based on New Jersey statutes, noting that "It has come to the Department's attention that there have been recurring instances of the inability of patients to obtain in-network benefits for the services of non-network surgeons performing breast reconstruction as part of the surgical procedure in which a mastectomy is performed. In some cases, carriers have been declining patient requests to use out-of-network surgeons, asserting the availability of in-network surgeons. However, the in-network surgeons frequently do not perform, or are not qualified to perform, the particular type of requested reconstructive surgery."

74. In this case, Defendants did not decline Patient NP's request to have Dr. Tamburrino and Dr. Blechman perform her breast reconstruction surgeries. Rather, knowing that there was no in-network provider who could perform these surgeries, Defendants paid Plaintiffs the out-of-network rate, which forced Patient NP to self-insure her own breast reconstruction surgeries.

75. The DOBI Commissioner concluded that when an insurer in New Jersey did not have a qualified breast reconstruction surgeon in its network, it should approve the use of an out-of-network specialist but ensure that its member receives this service at the in-network co-pay amount. This requirement ensures that a cancer patient under New Jersey law and with coverage under the WHCRA, as here, does not face ruinous balance bills simply by choosing an out-of-network specialist.

76. Defendants violated this law. Defendants should have ensured that Patient NP received her breast reconstruction surgeries such that her liability was limited to the in-network level of patient responsibility. Instead, Patient NP was charged out-of-network-level co-pays and faces balance billing.

### E. Full and Fair Review under ERISA

77. 29 C.F.R. § 2560.503-1(g) provides as follows:

**Manner and content of notification of benefit determination.**

(1) The plan administrator shall provide a claimant with written or electronic notification of any adverse benefit determination. Any electronic notification shall comply with the standards imposed by 29 CFR 2520.104b-1(c)(1)(i), (iii), and (iv). The notification shall set forth, in a manner calculated to be understood by the claimant -

(i) The specific reason or reasons for the adverse determination;

(ii) Reference to the specific plan provisions on which the determination is based;

(iii) A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary;

(iv) A description of the plan's review procedures and the time limits applicable to such procedures, including a statement of the claimant's right to bring a civil action under section 502(a) of the Act following an adverse benefit determination on review;

(v) In the case of an adverse benefit determination by a group health plan -

15

> (A) If an internal rule, guideline, protocol, or other similar criterion was relied upon in making the adverse determination, either the specific rule, guideline, protocol, or other similar criterion; or a statement that such a rule, guideline, protocol, or other similar criterion was relied upon in making the adverse determination and that a copy of such rule, guideline, protocol, or other criterion will be provided free of charge to the claimant upon request.

78. Defendants did not provide the information required by 29 C.F.R. § 2560.503-1(g), in violation of ERISA and the rules promulgated thereunder. The appeals submitted in this case requested that information. Defendants did not provide full and fair review to Plaintiffs.

79. In its March 27, 2018, appeal denial letter, IBC stated that the "the enrollee's claim was processed correctly in accordance with her Personal Choice plan provision for inpatient professional services performed by an out-of-network provider."

80. IBC further stated that "Covered Expense" meant "the lesser of the Medicare Professional Allowable Payment or of [sic] the Provider's charges for Covered Services." For services that were not recognized or reimbursed by Medicare, the amount was determined by an "applicable fee schedule or the Provider's charges." For services not recognized by this fee schedule, the amount was determined by reimbursing 50% of the Professional Provider's billed charges.

81. IBC did not explain how Tamburrino's claim was reimbursed. It stated that "out-of-network providers are reimbursed according to the Medicare professional allowable payment *or* the claim administrator's proprietary fee schedule." (emphasis added). IBC did not provide the specific reasons for the denial or refer to the specific plan provisions on which the determination was based. It referred to plan provisions in the disjunctive: reimbursement could have been based on Medicare, or it could have been based on a proprietary fee schedule. IBC refused to disclose which, meaning that Plaintiff could not effectively appeal.

82. Disclosure of "the specific rule, guideline, [or] protocol" meant that IBC had to go well beyond revealing which of these two sources it utilized. If it utilized a so-called "proprietary fee schedule" it was required to disclose its methodology for the code at issue, so that Prestige could meaningfully challenge it on appeal. Otherwise, this "proprietary fee schedule" remained what it continues to be: a black box. If IBC did not base its reimbursement on either Medicare on its "proprietary fee schedule," it was required to disclose this fact.

83. In its March 27, 2018, appeal denial letter, IBC failed to make the required disclosures under 29 C.F.R. § 2560.503-1(g), in violation of ERISA.

84. In its January 25, 2019, appeal denial letter, IBC stated that "it was determined the services were priced correctly" without further explanation. This was a violation of 29 C.F.R. § 2560.503-1(g) and ERISA.

85. When IBC sent EOBs for each of the lowered reimbursements at issue in this case, it simply stated that "[t]his is the difference between the provider's charge and our allowance." Such language, which has no explanatory value, failed to meet the detailed explanation standard required by ERISA for an adverse benefit determination.

86. In its May 25, 2018, appeal denial letter, IBC failed to make the required disclosures under 29 C.F.R. § 2560.503-1(g), in violation of ERISA.

87. It stated that the "the claim was processed correctly and in accordance with the Tier 3 benefits because the surgical services were rendered by an out-of-network provider." IBC did not provide the specific reasons for the denial or refer to the specific plan provisions on which the determination was based. IBC further stated that to find the definition of "Covered Expense" one must consult an unidentified benefit booklet.

88. In its August 17, 2018, appeal denial letter, IBC stated that "the claim has been processed correctly and in accordance with [NP's] out-of-network benefits." This letter provided no explanation at all for its adverse benefit determination, just a conclusion.

89. Through these failures, Defendants violated ERISA.

90. Under ERISA, upon a failure to follow the procedures set out in the Plan, as here, the claimant is deemed to have exhausted her administrative remedies.

91. Deemed exhaustion is set out in 29 C.F.R. § 2560-503-1, which states:

[I]n the case of the failure of a plan to establish or follow claims procedures consistent with the requirements of this section, a claimant shall be deemed to have exhausted the administrative remedies available under the plan and shall be entitled to pursue any available remedies under section 502(a) of [ERISA] on the basis that the plan has failed to provide a reasonable claims procedure that would yield a decision on the merits of the claim.

## COUNT I

### CLAIM AGAINST DEFENDANT HORIZON FOR UNPAID BENEFITS UNDER EMPLOYEE BENEFIT PLAN GOVERNED BY ERISA

92. Defendant Horizon is obligated to pay benefits to the Plan participant in accordance with the terms of the Plan, and in accordance with ERISA. This obligation arises under the Blue Card Program, and under ERISA.

93. Defendant Horizon violated its legal obligations under this ERISA-governed Plan when it, together with IBC and as its agent, under-reimbursed Plaintiffs for breast reconstruction surgeries provided to Patient NP by Plaintiffs, in violation of the terms of the Plan and in violation of ERISA § 502(a)(l)(B), 29 U.S.C. § 1132(a)(l)(B), for failing to provide for full and fair review.

94. Plaintiffs submitted invoices to Defendant Horizon for $293,533.29.

95. Defendant Horizon together with Defendant IBC determined that the Allowed Amount was $5,263.92, leaving an under-reimbursed amount of $288,269.37. Defendant thereby reimbursed 2% of the total amount.

96. Defendant Horizon acted as IBC's agent under the Blue Card Program. Plaintiffs were required to bill all amounts directly to Horizon.

97. Plaintiffs seek unpaid benefits and statutory interest back to the date Plaintiffs' claims were originally submitted to Defendant Horizon. They also seek attorneys' fees, costs, prejudgment interest and other appropriate relief against Defendant Horizon.

## COUNT II

### CLAIM AGAINST DEFENDANT IBC FOR UNPAID BENEFITS UNDER EMPLOYEE BENEFIT PLAN GOVERNED BY ERISA

98. Defendant IBC is obligated to pay benefits to the Plan participant in accordance with the terms of the Plan, and in accordance with ERISA. This obligation arises under the Blue Card Program, and under ERISA.

99. Defendant IBC violated its legal obligations under the Plan when it, together with Horizon, under-reimbursed Plaintiffs for breast reconstruction surgeries provided to Patient NP by Plaintiffs in violation of the terms of the Plan and in violation of ERISA § 502(a)(l)(B), 29 U.S.C. § 1132(a)(l)(B), for failing to provide for full and fair review.

100. Defendant IBC together with Defendant Horizon determined that the Allowed Amount was $5,263.92, leaving an under-reimbursed amount of $288,269.37. Defendant thereby reimbursed 2% of the total amount. Defendant thereby reimbursed 2% of the total amount.

101. Plaintiffs seek unpaid benefits and statutory interest back to the date Plaintiffs' claims were originally submitted to Defendant Horizon. They also seek attorneys' fees, costs, prejudgment interest and other appropriate relief against Defendant IBC.

**WHEREFORE**, Plaintiffs demand judgment in its favor against Defendants as follows:

(a) Ordering Defendants to recalculate and issue unpaid benefits to Plaintiffs;

        (b)     Awarding Plaintiffs the costs and disbursements of this action, including reasonable attorneys' fees under ERISA, and costs and expenses in amounts to be determined by the Court;

        (c)     Awarding prejudgment interest; and

        (d)     Granting such other and further relief as is just and proper.

Dated: January 15, 2020

        /s/ Michael F. Fried
AXELROD LLP
354 North Fourth Avenue
Highland Park, NJ 08904
(732) 718-6171
mfried@axelrodllp.com

Robert J. Axelrod
AXELROD LLP
800 Third Avenue, Suite 2800
New York, NY 10022
(646) 448-5263
rjaxelrod@axelrodllp.com

Leslie S. Howard
COHEN HOWARD LLP
766 Shrewsbury Avenue, Suite 200
Tinton Falls, NJ 07724
(732) 747-5202
lhoward@cohenhoward.com

Attorneys for Prestige Institute for Plastic Surgery, P.C. and Keith M. Blechman, M.D., P.C. on behalf of Patient NP